## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE WHITEHALL JEWELLERS, INC. | ) | No. 05 C 1050 |
| | ) | |
| SHAREHOLDER DERIVATIVE LITIGATION | ) | Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

On February 22, 2005, two shareholders filed this derivative action on behalf of Whitehall

Jewellers, Inc., (hereinafter, "Whitehall,") alleging various state and federal law claims against a

group of Whitehall's directors. As detailed below, Plaintiffs allege that these directors participated

in a rebate scheme that artificially inflated the value of Whitehall's inventory and resulted in a civil

suit against Whitehall as well as regulatory and criminal investigations. Eight months before this suit

was filed, on June 17, 2004, other Whitehall shareholders filed a similar derivative suit in the Circuit

Court of Cook County against the same directors named as defendants here. The Defendant

directors named in this suit have moved for the court to stay any further action on this suit until the

resolution of that state court suit. For the reasons explained below, the motion for stay is denied.

## STATEMENT OF FACTS[1]

Whitehall, a national retail jeweler, operates nearly 400 jewelry stores in thirty-eight states.[2]

(Consolidated Amended Derivative Complaint (hereinafter, "CAC,") ¶¶ 10, 45.) Whitehall

purchases its inventory from an assortment of vendors. (*Id.* at ¶ 30.) Derivative Plaintiffs allege that

Generally Accepted Accounting Principles (hereinafter, "GAAP,") require the purchaser of

---

[1] The facts are drawn from the Derivative Plaintiffs' Consolidated Amended Derivative Complaint (hereinafter, "CAC,") and assumed to be true for the purpose of resolving Defendants' motion to stay.

[2] Whitehall is also a Delaware corporation, principally headquartered in Illinois. (CAC ¶ 10.)

inventory to "write down" the value of the inventory from its purchase price to its fair market value as the inventory depreciates. (*Id.*) Contrary to this requirement, Derivative Plaintiffs allege, the Officer Defendants named in the case[3] negotiated an inventory rebate scheme with some of Whitehall's vendors, described more fully below. (*Id.*)

Chief Financial Officer Browne and Executive Vice Presidents M. Patinkin, Desjardins, and Brown arranged to return depreciated inventory to Whitehall's vendors and "receive excessive discounts, reimbursements, credits, or other 'vendor allowances'" equal to the full average cost at which Whitehall had purchased the inventory. (*Id.*) In return for these credits, valued far in excess of the fair market value of the returned, depreciated inventory, Whitehall agreed to purchase new, more expensive inventory from the participating vendors. (*Id.*) The Officer Defendants' failure to adhere to GAAP and their conduct in engaging in this inventory rebate scheme resulted in an inflation of Whitehall's inventory balances and net income on the books. (*Id.* at ¶ 31.)

Meanwhile, beginning in 2001, one of Whitehall's vendors, Cosmopolitan Gem Corporation (hereinafter, "Cosmopolitan"), had run into financial trouble. (*Id.* at ¶ 33.) Capital Factors, Inc. (hereinafter, "Capital,") had "made millions of dollars" in loans to Cosmopolitan, secured by

---

[3]      Derivative Plaintiffs named Matthew M. Patinkin ("M. Patinkin"), a director of Whitehall from 1989 to 2004 and Executive Vice President of Operations since 2000, (CAC ¶ 11); John R. Desjardins, a director of Whitehall from 1989 to 2004, Executive Vice President since 1989, and Chief Financial Officer since 2003, (*id.* at ¶ 12); Manny A. Brown, Executive Vice President of Operations since 1997, (*id.* at ¶ 13); and Jon H. Browne, Executive Vice President and Chief Financial Officer up to his termination in December of 2003. (*Id.* at ¶ 14.) These four defendants are collectively known as the "Officer Defendants." (*Id.* at ¶ 15.)
       In addition, Derivative Plaintiffs also named three Defendants referred to here as the "Audit Committee Defendants." (*Id.* at ¶ 19.) They are Richard K. Berkowitz, a Whitehall director since 1998 and Chairman of the Audit Committee, (*id.* at ¶ 16); Daniel H. Levy, a Whitehall director since 1997 and member of the Audit Committee, (*id.* at ¶ 17); and Sanford Shkolnik, a Whitehall director since 2003 and member of the Audit Committee. (*Id.* at ¶ 18).
       Finally, Plaintiffs named an additional Defendant–Norman J. Patinkin ("N. Patinkin"), who served as a director of Whitehall since 1989. (*Id.* at ¶ 20.)
       The complaint does not set out the citizenship of any of the individually named Defendants.

Cosmopolitan's accounts receivable. (*Id.*) When Cosmopolitan sought additional loans from Capital and asked the Officer Defendants to help conceal Cosmopolitan's precarious financial condition from Capital, the Officer Defendants obliged. (*Id.*) With the Officer Defendants' assistance, Cosmopolitan created fictitious account statements showing receivables owed by Whitehall and payments from Whitehall applied to those receivables, totaling some $13.9 million in the several months prior to March 2002. (*Id.* at ¶¶ 34, 35.) These machinations created the illusion that Cosmopolitan was collecting its aging receivables, improving that part of Cosmopolitan's books which Capital would examine in deciding whether or not to extend Cosmopolitan additional credit. (*Id.* at ¶ 34.) Whitehall received discounts, credits, and other vendor allowances on its inventory purchases from Cosmopolitan in exchange for its participation in the scheme.[4] (*Id.*)

At Cosmopolitan's request, Whitehall designated the payments to Cosmopolitan as "on account" rather than for any particular invoice. (*Id.* at ¶ 35.) At some point (the date is not identified in the complaint), Capital asked Cosmopolitan and Whitehall to provide it with more information regarding the invoices to which Cosmopolitan applied the "on account" payments. (*Id.* at ¶ 36.) Instead of presenting Capital with any statement showing the large number of deductions and credits Whitehall had received from Cosmopolitan, Whitehall CFO Browne, Cosmopolitan's controlling shareholder Joshua Kestenbaum, and Cosmopolitan Chief Financial Officer Christopher Shaw created and presented a phony statement that did not reflect many of the deductions and credits and showed Whitehall's "on account" payments as being applied to aging Whitehall receivables. (*Id.* at ¶¶ 37, 38.) Browne, Kestenbaum, and Shaw submitted at least three such phony

---

[4]    It is unclear whether Derivative Plaintiffs are alleging that Cosmopolitan participated in Whitehall's inventory rebate scheme *in addition to* this alleged scheme to defraud Capital. What is clearly alleged is that an investigation into the relationship between Cosmopolitan and Whitehall as it related to the attempt to defraud Capital caused Whitehall's inventory rebate scheme to unravel as well.

statements to Capital over the course of several months beginning in April 2002 and ending in September 2002. (*Id.* at ¶¶ 37, 39.)

Capital seems to have caught on; in August 2003, it brought a $30 million lawsuit against Whitehall and Cosmopolitan, as well as several other defendants, alleging a scheme to defraud Capital by inducing it to advance Cosmopolitan funds by means of misrepresentations concerning Cosmopolitan's financial state. (*Id.* at ¶¶ 41, 45.) Perhaps tipped off by the civil suit and by a March 5, 2003 Whitehall press release declaring an intention to restate its financial statements for the first three fiscal quarters of 2002,[5] the Securities and Exchange Commission (hereinafter, "SEC,") and United States Attorney for the Eastern District of New York initiated an investigation into Whitehall in November 2003. (*Id.* at ¶¶ 40, 42, 43).

On November 21, 2003, Whitehall issued a press release announcing that its internal investigations had discovered that its Executive Vice President of Merchandising Lynn Eisenheim had violated company policy by failing to document the age of certain inventory. (*Id.* at ¶¶ 43, 45.) Whitehall asserted that Eisenheim's failures related to less than one percent of Whitehall's total current inventory and that this violation was unrelated to the Capital lawsuit. (*Id.*) On December 11, 2003, a Whitehall press release announced the termination of Jon H. Browne as Chief Financial Officer and the appointment of Executive Vice President John R. Desjardins to that position. (*Id.* at ¶ 44.) Following this announcement, Whitehall's stock value fell 75 cents to $9.04, part of a 29 percent decline in value since receiving its SEC subpoena in November. (*Id.* at ¶ 45.)

---

[5]     According to the Whitehall press release:
The cumulative impact of the adjustments for the first three fiscal quarters was to increase the Company's net loss from $0.29 per share to $0.31 per share . . . . The quarterly impact of these adjustments is to increase net income by $127,000 in the first fiscal quarter, reduce net income by $457,000 in the second fiscal quarter and to reduce net loss by $72,000 in the third quarter.
(CAC ¶ 40.)

On December 22, 2003, Whitehall released its third quarter results for 2003, reporting a $0.53 per share net loss (as compared to $0.35 per share net loss for the same quarter a year earlier) and laying some of the blame on fees related to the Capital lawsuit, the SEC investigation, and the criminal inquiry. (*Id.* at ¶ 46.) Whitehall also announced that it would be restating its financial reports for 2000, 2001, 2002, and the six-month period ending in July 31, 2003.[6] (*Id.* at ¶¶ 46, 47.) Whitehall's press release explained that "[t]he restatements primarily reflect the Company's revision of the accounting treatment for vendor allowances associated with the Company's return of substandard inventory to vendors." (*Id.* at ¶ 46.) CFO Desjardins offered further details to analysts and investors during a December 22, 2003 phone call. (*Id.* at ¶ 47.) As recorded in a transcript of that conference call, Desjardins reported:

> The company enjoyed strong ongoing relationships with many of its suppliers. Based upon the strength of those relationships, the company would, from time to time, negotiate separate agreements, distinct from the terms of our standard trading agreements, under which vendors accepted returns of certain substandard inventory, [sic] the full credit of the company's weighted average cost of those items. Generally these returns were accepted by the vendor in conjunction with the placement of purchase orders for fresh inventory. The company did not record a reserve associated with the impairment of substandard inventory. As a result of a reevaluation of the relevant accounting guidelines, Whitehall will now record an impairment charge associated with substandard inventory in each reporting period. Thereafter, as returns of substandard inventory are made, the company will reflect the implicit benefit of the lower inventory cost related to the impairment reserves in its cost of sales over the inventory turnover period associated with the new inventory being purchased from the vendor.

(*Id.* at ¶ 47.) Litigation and investigation costs, running into the millions, continued to affect Whitehall's performance for the next four fiscal quarters. (*Id.* at ¶¶ 49-52, 55.) On September 28,

---

[6] According to the Whitehall press release:
The impact of these restatements will decrease Whitehall's earnings per diluted share by $0.01 for fiscal 200, $0.03 for fiscal 2001, $0.02 for fiscal 2002 and decrease the loss by $0.01 for the six month period ended July 31, 2003.
(CAC ¶ 46.)

2004, Whitehall announced that it had settled the litigation with Capital by paying Capital $10.8 million. (*Id.* at ¶ 54.) The U.S. Attorney for the Eastern District of New York also agreed not to file charges against Whitehall, on the condition that Whitehall made restitution to Capital and paid $350,000 to the United States. (*Id.*)

According to Whitehall's proxy statements, the Board of Directors met eleven times during 2002 and 2003. (*Id.* at ¶ 56.) The Audit Committee, including the Audit Committee Defendants in this case, met twenty-one times during this period. (*Id.*) Derivative Plaintiffs allege that each director was in attendance at each meeting and had full knowledge of Whitehall's improper business and accounting practices. (*Id.*) Furthermore, the Officer Defendants received salaries, cash bonuses, shares of Whitehall stock, and options to purchase Whitehall stock based on the inflated financial statements initially issued for fiscal years 2000 through 2003. (*Id.* at ¶ 59.) The Officer Defendants also sold shares of Whitehall stock to unspecified purchasers at the end of March 2002 and at the beginning of June 2002, at a price which did not reflect their private knowledge that Whitehall was engaged in improper business and accounting practices that would necessitate a restatement of the company's financial statements and lower the share price. (*Id.* at ¶ 64-65.)

## PROCEDURAL HISTORY

Myra Cureton, a California shareholder in Whitehall, filed a complaint in this court on February 22, 2005. Cureton sued derivatively on behalf of nominal defendant Whitehall and named as Defendants M. Patinkin, Desjardins, Brown, Berkowitz, Levy, Shkolnik, and N. Patinkin, as well as Whitehall President Hugh M. Patinkin.[7] As originally filed, the *Cureton* complaint stated a single state law claim for breach of fiduciary duty, invoking the federal court's diversity jurisdiction.

---

[7] Hugh M. Patinkin passed away in March 2005.

On April 13, 2005, Tai Vu, also a California shareholder in Whitehall, filed a similar state law claim against the same defendants in this court. On May 25, 2005, this court granted a motion for reassignment of the *Vu* case as related to *Cureton*. Derivative Plaintiffs filed their consolidated amended derivative complaint on June 20, 2005, *sub nom*, *In re Whitehall Jewellers, Inc. S'holder Derivative Litig*. The complaint names M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. In addition to the original breach of fiduciary duty claim against all Defendants, Derivative Plaintiffs charged the Officer Defendants with one count for violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 and two additional state law claims for unjust enrichment and a breach of the fiduciary duty of loyalty in the form of insider trading. The final count was levied against Defendant Browne alone and sought reimbursement for Whitehall pursuant to § 304 of Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243. This complaint now asserts both diversity and federal question jurisdiction.

On July 15, 2005, Defendants filed this motion to stay proceedings pursuant to the *Colorado River* Abstention Doctrine. They ask that this court abstain from taking further action on this case pending the outcome of *Cusak v. Patinkin, et al.*, Case No. 04 CH 9705, a shareholder derivative action filed on June 17, 2004, in the Circuit Court of Cook County on behalf of Whitehall and arising from the same factual allegations set out above.

As amended,[8] the *Cusak* complaint names the executor of Hugh Patinkin's estate, as well as, M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. It includes seven counts under state law: (1) breach of fiduciary duty, (2) abuse of control, (3) gross mismanagement, (4) waste of corporate assets, (5) unjust enrichment, (6) insider selling and misappropriation of information, and (7) contribution and indemnification.

---

[8]     The record does not include the *Cusak* complaint as originally filed.

Prior to ruling on this motion, the *Cusak* action was consolidated with two additional shareholder derivative actions[9] filed in state court. The newly consolidated *Cusak* action is the potentially parallel state proceeding to which Defendants point in making their request for a stay.

## DISCUSSION

Because the federal courts can hear state claims, *see* 28 U.S.C. §§ 1332, 1367, and state courts can hear certain federal claims, *see* Ill. Const., Art. VI, §§ 4, 9, it is possible for the same plaintiff to bring the same cause of action against the same defendant simultaneously in separate federal and state cases. "Generally as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'" *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). Indeed a federal district court's duty to exercise its jurisdiction where the district court has it is "virtually unflagging."[10] *Colorado River*, 217 U.S. at 817. That said, although the circumstances in which a federal court will

---

[9] On April 19, 2005, *Perles v. Estate of Hugh Patinkin, et al.*, Case No. 05 CH 6926, named the executor of Hugh Patinkin's estate, and M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, N. Patinkin, and Jack A. Smith (another Whitehall director) as Defendants. The *Perles* complaint alleged the same first six causes of action as the *Cusak* complaint and added a seventh count for aiding and abetting breaches of fiduciary duty, as well as two counts specifically against Whitehall's independent auditor, Pricewaterhouse Coopers, LLP, also a party to the litigation. On June 13, 2005, *Lynch v. Berkowitz, et al.*, Case No. 05 CH 6926, named the executor of Hugh Patinkin's estate, and M. Patinkin, Desjardins, Brown, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. The *Lynch* complaint, like the *Cureton* and *Vu* complaints, alleged just one count, a state law claim for the breach of fiduciary duty.

[10] Defendants have requested a stay, not an abstention *per se*. With an abstention, a court declines to exercise jurisdiction that it has over a case, while with a stay, the court is technically exercising its jurisdiction, but simply putting off taking any action in the case. Significantly, however, in cases where a stay has been requested under the *Colorado River* Abstention Doctrine, the Seventh Circuit has chosen to analyze the case as if the request were for an abstention. *See, e.g.*, *Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004) (applying the two-part abstention analysis framework to a request to stay a derivative shareholder suit).

stay a federal action on account of the pendency of a similar state action in state court are very limited, such circumstances "do nevertheless exist." *Id.* at 818.

In *Clark v. Lacy*, the Seventh Circuit had before it a federal shareholder derivative suit involving "the same factual predicate, most of the same defendants, and fundamentally the same legal issues" as a derivative shareholder suit brought by a different plaintiff in state court. 376 F.3d 682, 684 (7th Cir. 2004). In considering whether the district court had abused its discretion in staying the federal case, the *Clark* court adopted a two-part test. The first step in the analysis is to determine "'whether the concurrent state and federal actions are actually parallel.'" *Id.* at 685 (quoting *LaDuke v. Burlington N. R.R. Co.*, 879 F.2d 1285, 1287 (7th Cir. 1988)). Any doubt regarding the parallel nature of a federal and state action ought to be resolved in favor of the exercise of federal jurisdiction where it has been given to the federal district court. *See AAR Int'l, Inc. v. Nimelias Enter. S.A.*, 250 F.3d 510, 520 (7th Cir. 2001) (finding that a federal action alleging the breach of one provision of a lease was not parallel to pending foreign litigation alleging the breach of another provision of that same lease where the claims in the federal action "are distinct from and independent of" the claims in the pending foreign litigation).

Parallelism is not, in and of itself, exceptional, and not all parallel actions merit the restraint of a federal court's exercise of granted jurisdiction, however. And when the party moving for the stay succeeds in making a showing of parallelism, it must also show that there are additional exceptional circumstances counseling for a stay. *Clark*, 376 F.3d at 685. In making this calculation, courts should consider:

> (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8)

the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim.

*Id.* (citing *LaDuke*, 879 F.2d at 1559). In assessing these issues, "[n]o one factor is necessarily determinative." *Colorado River*, 424 U.S. at 819. The overall focus of the inquiry is whether or not the case before the court is so truly exceptional that a stay reflects the proper balance between the court's "virtually unflagging obligation" to exercise its jurisdiction and the promotion of "wise judicial administration." *Id.* at 817-18.

For the reasons explained here, the court concludes that Defendants have not met the first requirement in the *Clark* court's two-step framework. Accordingly, the court need not discuss how the instant case and the *Cusak* action would have fared under the ten-factor *Clark* analysis for exceptional circumstances.

**Parallel Cases**

In order to meet the test of parallelism, the two "suits need not be identical." *Clark*, 376 F.3d at 686 (citing *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988)). Instead, one suit will be deemed parallel to another to the extent that "'substantially the same parties are contemporaneously litigating the same issues in another forum,'" *Clark*, 376 F.3d at 686 (quoting *Calvert Fire Ins. Co. v. Am. Mut. Reins. Co.*, 600 F.2d 1228, 1229 n.1 (7th Cir. 1979)). The *Clark* court observed: "To be sufficiently similar it is not necessary that there be formal symmetry between the two actions. Rather, there should be a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." 376 F.3d at 686 (internal quotation marks and citations omitted). In determining that a federal shareholder derivative suit was parallel to a state shareholder derivative suit, the *Clark* court observed that both lawsuits involved the same or substantially the

10

same parties of interest, the same or substantially the same factual predicate, and effectively the same or substantially the same claims. *Id.* at 686-87.

As in *Clark*, the parties to both this federal lawsuit and the state consolidated *Cusak* action are substantially the same. In a derivative shareholder action, the true party of interest is the corporation on whose behalf shareholders sue. *Clark*, 376 F.3d at 686. In both the instant federal action and *Cusak*, the shareholders prosecuting the suit, Cureton/Vu and Cusak/Perles/Lynch, respectively, do so on behalf of Whitehall. As such, the plaintiffs in both lawsuits are the same. M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin are the Defendants in the case before this court. The *Cusak* action also names each of them as defendants. That the *Cusak* action names additional defendants as well does not defeat a finding of parallelism. The Seventh Circuit has held that parallelism requires the parties to be "*substantially* the same–not completely identical." *Id.* at 686; *see also Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1156 (7th Cir. 1990) (in a personal injury case, finding parallelism with federal action even though state plaintiff named additional defendants in the state action).

As was the situation in *Clark*, here the factual predicate of the pending federal case is the same as that of the state consolidated *Cusak* action. *Clark*, 376 F.3d at 687. Both actions arise from the same set of alleged facts: Whitehall directors engaged in an inventory rebate scheme that did not comport with GAAP; Whitehall assisted Cosmopolitan in defrauding Capital; Capital sued Whitehall; and regulatory and criminal investigations followed while Whitehall repeatedly restated its financial reports. Derivative Plaintiffs do not argue to the contrary.

As in *Clark*, the state law claims raised here and in the *Cusak* action appear to be parallel.[11]

The situation here differs from *Clark*, however, in that two federal claims are raised here but not in

*Cusak*. First, Derivative Plaintiffs here have alleged a claim against former CFO Browne under § 304

of the Sarbanes-Oxley Act. That section reads in relevant part:

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for–(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and (2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243(a). Defendants argue that any claim under § 304 "is subsumed within the

plaintiffs' state law claims." (Defendants' Reply in Support of the Outside Directors' Motion to Stay

(hereinafter, "Defs.' Reply"), p. 3.) The court is uncertain of the thrust of this argument,[12] but

---

[11]    The fact that certain state law claims appear in the federal complaint but not in the state lawsuit would not necessarily defeat a finding of parallelism. In *Clark*, both the federal and state suits alleged a breach of fiduciary duty under state law. 376 F.3d at 684. The federal suit in *Clark* also included additional claims for abuse of control, gross mismanagement, and waste of corporate assets. *Id.* The Seventh Circuit was untroubled by these differences. The *Clark* court observed that "the parallel nature of the actions cannot . . . be dispelled by repackaging the same issue under different causes of action." *Id.* at 687. Abuse of control, gross mismanagement, and waste of corporate assets are all premised on a breach of fiduciary duty under state law and as such are treated as the same cause of action for the purpose of determining parallelism. *See id.* at 686. In any event, the three state law claims raised in the federal case before this court are also raised in the *Cusak* action.

[12]    Defendants originally claimed that the § 304 claim was "subsumed by the broader remedies sought in the state court actions based on Defendant Browne's alleged violations of his common law duties." (Defendants' Memorandum of Law in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Mem."), pp. 8-9.) Derivative Plaintiffs correctly pointed out that the primary thrust of the parallelism inquiry is on parallelism in the *cause of action*, not parallelism in the *remedies* sought. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay (hereinafter, "Pls.' Mem."), p 8); *see also Clark*, 376 F.3d at 687 ("Even though an additional remedy is sought in the federal action, the liability issues (which are the central issues) remain the same in both cases.").

Defendants point out that a predicate to § 304 liability is the proof of misconduct, itself established, like the preceding state law claims in *Clark*, by proof of a fiduciary breach. (*Id.* at 4.) Derivative Plaintiffs contest that assertion; they deny the need to plead or prove any common law violation in order to prevail on this claim. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay (hereinafter, "Pls.' Mem."), p 8.)

The court concludes it need not resolve this dispute. The Derivative Plaintiffs' allegation of a violation of Sarbanes-Oxley drops out of the analysis for the purpose of determining parallelism between the instant federal action and the pending state action because § 304 does not give rise to a private right of action. In their reply memorandum, Defendants note doubt as to whether Congress intended to create a private right of action in § 304 of the Sarbanes-Oxley Act. (Defs.' Reply, pp. 2-3.) At the time of briefing only one federal district court had gone so far as to explicitly hold that § 304 did not create a private right of action, *Neer v. Pelino*, 389 F. Supp. 2d 648 (E.D. Pa. 2005), but other courts have since followed. *See, e.g.*, *In re Bisys Group Inc. Derivative Action*, 396 F. Supp. 2d 463 (S.D.N.Y. 2005) (following *Neer*); *see also* Don Zupanec, *Sarbanes-Oxley Act–Private Right of Action*, 20(11) FEDERAL LITIGATOR 4 (Nov. 2005) ("There is some risk in concluding, based on a single decision, that there is no implied right of action under § 304. Yet it is difficult to discern any clear Congressional intent to allow private enforcement."). For the reasons explained here, this court, too, agrees with *Neer*.

Section 304 calls for the forfeiture of bonuses and profits by a corporation's CEO or CFO when material noncompliance with reporting requirements and misconduct require the restatement of a corporation's financial statements. *See* 15 U.S.C. § 7243(a). Section 304 does not explicitly

create a private cause of action,[13] nor has any court recognized an implied private right of action. *Bisys Group*, 396 F. Supp. 2d at 464; *Neer*, 389 F. Supp. 2d at 652. Under the familiar four-part test set out in *Cort v. Ash*, an implicit private cause of action is more likely to be found when: (1) a plaintiff is part of the class for whose benefit Congress enacted the statute; (2) there is an indication of the existence of a private right based on the common tools of statutory interpretation including an examination of legislative history and the structure of the statute; (3) a remedy would be consistent with the legislative scheme; and (4) the cause of action is not one traditionally relegated to state law. 422 U.S. 66, 78 (1975). The *Neer* court reached its conclusion that no private right of action exists under § 304 after examining several textual arguments, the structure of other provisions of Sarbanes-Oxley, and the legislative history of the enactment of § 304. 389 F. Supp. 2d at 653-57.

Such an extensive analysis is arguably unnecessary here. The Supreme Court noted in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, "there is no need for us to 'trudge through all four of the [*Cort*] factors when the dispositive question of legislative intent has been resolved.'" 456 U.S. 353, 388 (1982) (concluding that a private right of action survived the 1974 amendments to the Commodities Exchange Act) (quoting *California v. Sierra Club*, 451 U.S. 287, 302 (1981) (Rehnquist, J., concurring) (no implied right of action for violation of the Rivers and Harbors Appropriation Act)). The *Bisys Group* court pointed out that

---

[13]     In *Neer v. Pelino*, the derivative plaintiff cited the statutory language "the chief executive officer and chief financial officer of the issuer shall reimburse the issuer" in support of the proposition that § 304 of the Sarbanes-Oxley Act explicitly creates a private right of action in the issuer. 389 F. Supp. 2d 648, 653 (E.D. Pa. 2005). The *Neer* court observed that "[a]lthough Congress created a remedy that would indirectly benefit . . . shareholders, 'whether Congress intended additionally that [this] provision[] would be enforced through private litigation is a different question.'" *Id.* at 653-54 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979)).

> there is nothing in the legislative history [of Sarbanes-Oxley] to suggest an intention to create a private right of action. In fact, the legislative history suggests strongly that Congress intended that Section 304 be enforced only by the Securities and Exchange Commission. This stands in sharp contrast to Section 306, which expressly creates a private cause of action to recover profits by officers and directors from insider trading during pension fund blackout periods.

396 F. Supp. 2d at 464 (citations omitted). At least for the purpose of the parallelism inquiry here, this court is inclined to concur with its colleagues in *Neer* and *Bisys Group* that no private right of action is available under § 304; thus, that federal claim effectively drops out of the case for the purpose of determining the parallel nature of this action and *Cusak*.

The second federal claim asserted by Derivative Plaintiffs, a securities violation under Rule 10b-5, cannot be discounted so readily, however. Defendants argue that the securities claim should also be set aside. Defendants initially speculate that Derivative Plaintiffs are engaged in gamesmanship to avoid an unfavorable ruling on this motion, calling the Rule 10b-5 federal claim "transparently frivolous," "wholly without merit," and "contrived" to avoid abstention. (Defendants' Memorandum of Law in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Mem."), p. 9.) The Derivative Plaintiffs' motivations to one side, it is settled law that private parties may sue for violations of § 10(b) of the Exchange Act, *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1017 (7th Cir. 2002) (offering a brief history of the judicial creation of the private right of action). Plaintiff's attempting to do so must meet certain pleading requirements: "To state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir.

1996).  Moreover, the Private Securities Litigation Reform Act (hereinafter, "PSLRA"), 15 U.S.C.

§ 78u-4(b), imposes heightened pleading requirements for allegations of securities fraud:

> Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Makor Issues & Rights, Ltd. v. Telltabs, Inc.*, __ F.3d __, 2006 WL 172142, *4 (7th Cir. 2006)

(quoting 15 U.S.C. § 78u-4(b)(1), (2)).

Defendants argue that Derivative Plaintiffs have failed to meet this heightened pleading

standard with respect to the Rule 10b-5 claim because Derivative Plaintiffs have not alleged fraud

*in connection with the purchase or sale* of Whitehall stock *by Whitehall itself*.  (Defs.' Reply, p. 6.)

Derivative Plaintiffs allege that M. Patinkin, Desjardins, Brown, and Browne sold very specific

quantities of Whitehall shares on very specific dates in late March and early June of 2002 at a price

that reflected their misstatements and omissions related to the alleged inventory rebate scheme.

(CAC ¶¶ 64-66.)  These *sales* do not form the basis of the derivative 10b-5 claim against these

Whitehall directors, however.  Instead, Derivative Plaintiffs allege that these directors deceived

Whitehall in connection with the *issuance* "of Whitehall restricted stock and options to purchase

Whitehall common stock" as part of the Whitehall executive compensation package.  (*Id.* at ¶ 76.)

Derivative Plaintiffs are far less specific about the relevant quantities and dates pertaining to these

transactions than they were about the March and June 2002 sales by the Whitehall directors.

The complaint sets out the value of the restricted shares Defendants M. Patinkin, Desjardins,

Brown, and Browne received from Whitehall as part of their executive compensation package.  It

does not, however, state when Whitehall issued those shares, beyond setting out the year in which

the transaction occurred, nor does the complaint even note how many of these shares Whitehall issued to the Officer Defendants. (*Id.* at ¶ 59.) Such a cursory allegation with respect to an essential element of the Rule 10b-5 claim might fall below the PSLRA threshold of particularity for fraud-style actions. *See, e.g., In re: VMS Sec. Litig.*, 752 F. Supp. 1373, 1393 (N.D. Ill. 1990) (dismissing a securities fraud complaint for the same deficiency under the arguably more forgiving pre-PSLRA pleading requirements). In the ordinary instance, however, a plaintiff whose complaint is dismissed for failure to meet particular pleading rules will have leave to file an amended complaint.[14]

Defendants here argue that giving Derivative Plaintiffs an opportunity to amend their complaint would be futile. (Defs.' Reply, p. 7.) Derivative Plaintiffs will be unable to establish the necessary element of reliance by Whitehall, Defendants contend, as they have already alleged that "all of the directors knew of the alleged fraud when they issued stock-based compensation to the officer defendants." (*Id.*) Because a corporation can only act through its directors and officers, Defendants point out, the Whitehall corporation, which is the true plaintiff in this action, knows everything its directors and officers know, and could not have been misled. (*Id.*) Where all of the directors and officers know that Whitehall's financial statements are lies, Whitehall cannot deceive

---

[14]     Defendants also allege that Derivative Plaintiffs have not pleaded scienter with the requisite level of specificity. (Defendants' Reply in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Reply"), p. 6.) Derivative Plaintiffs allege that:
> The Individual Defendants . . . had actual knowledge of Whitehall's improper business and accounting practices . . . In breach of their fiduciary duty of good faith, the Individual Defendants willfully ignored the Company's obvious and pervasive misconduct.
(CAC ¶¶ 56-57.) Derivative Plaintiffs also allege that this knowledge came from the attendance of particular meetings during particular years. (*Id.* at ¶ 56.)
     Even if this court were inclined to agree with Defendants, its conclusion on whether or not this deficiency should warrant a stay of the Derivative Plaintiff's entire federal action rather than merely leave to file a more particular amended complaint would be the same. Defendants can, of course, make a separate motion to dismiss the Derivative Plaintiffs' Rule 10b-5 claim if they wish.

itself into believing the lie when issuing stock-based compensation back to these same directors and officers. (*Id.*)

Defendants cite *Ray v. Karris*, 780 F.2d 636 (7th Cir. 1985), in support of this proposition. (Defs.' Reply, p. 7.) In *Ray*, the Seventh Circuit affirmed the dismissal of the plaintiffs' derivative Rule 10b-5 claim where the plaintiffs alleged that, after learning that federal banking regulations would require the divestment of certain assets held by the bank through a wholly-owned subsidiary, defendant bank directors offered to sell the bank's shares in the subsidiary to the bank's shareholders. 780 F.2d at 638-39, 643. These directors depressed the selling price of these shares by encumbering the subsidiary's primary asset and issuing an allegedly falsely gloomy memorandum regarding the value of shares in the subsidiary. *Id.* at 639. This enabled the bank's crooked directors themselves to buy a disproportionate quantity of the bank's stock in its subsidiary and deprived the bank of the full sale value of its divested assets. *Id.* The *Ray* court was particularly interested in the facts that one of the plaintiffs, himself a former bank director, knew of the defendant directors' proposed scheme and that minority shareholders in the bank had unsuccessfully attempted to enjoin the sale before it occurred. *Id.* at 643. In dismissing the *Ray* plaintiffs' derivative Rule 10b-5 claim, the Seventh Circuit held that where disinterested directors and minority shareholders know about the fraud that is about to be perpetuated on the corporation, the court will impute the knowledge of the crooked directors to the corporation. *Id.* at 641-42. Accordingly, the corporation will be unable to establish a securities fraud claim. *Id.*

The instant case is similar to *Ray*, Defendants suggest, citing the Derivative Plaintiffs' allegation that "[t]he Company's executive officers, with knowledge and approval of the other Individual Defendants, regularly and systematically engaged in a fraudulent scheme." (CAC ¶ 3.) In the court's view, however, this passage plainly does not imply that minority shareholders in

Whitehall knew of the "fraudulent scheme" before it occurred–it says nothing about the knowledge of minority shareholders at all. Nor does this passage say anything about the knowledge of disinterested Whitehall directors.

Because Defendants have not sketched out this argument much beyond a citation of *Ray* and recitation of its holding, the court is uncertain about how exactly Defendants believe it applies. The allegation Defendants have quoted states that all of the Defendants knew about the inventory rebate scheme, yet Derivative Plaintiffs are suing only the Officer Defendants under Rule 10b-5 claim. Perhaps Defendants believes that the other individual Defendants–those not facing the 10b-5 claim–are "disinterested." An investigation into the origin of the Seventh Circuit's decision in *Ray* defeats any such argument.

*Dasho v. Susquehanna Corp.* established the right of a shareholder to bring a derivative suit under Rule 10b-5 in the Seventh Circuit. 380 F.2d 262 (7th Cir. 1967). The *Dasho* court recognized the awkward position that a derivative plaintiff is in with respect to pleading the requisite elements of a Rule 10b-5 claim: the plaintiff must avoid negating the element of reliance despite the standard notion that a corporation knows what its directors and officers, crooked or not, know. The Second Circuit had issued inconsistent panel decisions on just this issue a few years earlier. In *Ruckle v. Roto Am. Corp.*, the Second Circuit rejected the proposition that the knowledge of a few defrauding directors would be attributed to the defrauded corporation, thereby eviscerating its necessary claim to deception. 339 F.2d 24, 29 (2d Cir. 1964). The *Ruckle* court observed:

> When it is practical as well as just to do so, courts have experienced no difficulty in rejecting such cliches as the directors constitute the corporation and a corporation, like any other person, cannot defraud itself. If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B-5 is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely

19

> because a fraud was committed by a director rather than by an outsider. Denial of
> relief on this basis would surely undercut the congressional determination to prevent
> the public distribution of worthless securities.

*Id.* at 29. Less than a month later, another panel of the Second Circuit declined to follow *Ruckle*

where the entire board of directors was involved in the suspect transaction, instead imputing the

knowledge of the directors to the corporation to undercut the derivative 10b-5 action. *O'Neill v.*

*Maytag*, 339 F.2d 764, 767 (2d Cir. 1964). In a "concurring" opinion signed by two of the three

judges on the Seventh Circuit panel in *Dasho*, our Court of Appeals sided with the *Ruckle* rationale

and concluded that a different rule–depending on whether some or all of a corporation's directors

were involved in the alleged fraud–was unnecessary. 380 F.2d at 270 (Fairchild, J. and

Cummings, J., concurring).

In 1977, the Supreme Court constricted the scope of the private right of action under Rule

10b-5 by exempting from the scope of federal securities law breaches of state law fiduciary duty not

involving a stock issuer's disclosure obligations. *Santa Fe Indus. v. Green*, 430 U.S. 462, 477-80

(1977). Following this decision, the Second Circuit reaffirmed the validity of the derivative 10b-5

action under limited circumstances in *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977). The

Seventh Circuit interpreted *Goldberg* in *Ray*, explaining, "the basis of this type of action is that the

full disclosure policy, which is the fundamental purpose of the [Exchange] Act according to *Santa*

*Fe* . . . is implicated even in cases of breaches of state fiduciary law where deception serves to deprive

the corporation of its preventative remedies under state law." *Ray*, 780 F.2d at 642 (internal

quotation marks and citations omitted) (citing *Goldberg*, 567 F.2d at 218).

The *Ray* court acknowledged that "[g]enerally the 'knowledge' of the corporate entity will

turn on whether a disinterested majority of the shareholders or directors . . . ratified the securities

transference after full disclosure [by the potentially defrauding directors]." *Id.* The *Ray* court

concluded, nevertheless, that a corporation may be found to know what its defrauding directors know without disclosure and ratification where disclosure was unnecessary to alert disinterested directors and minority shareholders that they should avail themselves of state law remedies to protect the corporation. 780 F.2d at 641 (citations omitted). In *Ray*, the plaintiff director was on the bank's board of directors when the board made the decision to transfer some of the bank's assets to the subsidiary, giving him knowledge about the true value of shares in the subsidiary. *See id.* at 638. That plaintiff director had resigned, however, and, because he did not participate with the other defendant directors in the encumbering of the subsidiary's assets or the publication of an overly pessimistic statement about the value of the subsidiary, he had no liability under state law. *See id.* at 638-39. Thus the plaintiff director in *Ray* was disinterested and had knowledge that would have equipped him to defend the bank via state law remedies, even without a disclosure on the part of the defendant directors.

Any Whitehall director not charged with the Rule 10b-5 violation in the instant case is not similarly independent. For instance, the Audit Committee Defendants certainly knew, according to the allegations, that the Officer Defendants had misstated the financial statements in order to induce Whitehall to issue them more shares at an artificially higher price as part of their executive compensation package. Unlike the disinterested director in *Ray*, these members of the Audit Committee could not protect Whitehall by availing themselves of state law remedies because in doing nothing to stop the inventory rebate scheme, the Audit Committee Defendants themselves had violated state law fiduciary duties. The Derivative Plaintiffs' complaint here does not allege the existence of any directors who might have been able to blow the whistle on the Officer Defendants prior to the alleged securities violation. *Ray* is, thus, inapplicable. This court applies instead the general rule that the knowledge of the allegedly defrauding directors will not be imputed to the

corporation to negate reliance without disclosure by the allegedly defrauding directors and ratification by the remaining directors or shareholders. *See Dasho*, 380 F.2d at 270 ("concurring" opinion). Under this rule, Defendants' argument that Derivative Plaintiffs have pleaded themselves out of court fails.[15]

## CONCLUSION

The Derivative Plaintiffs' Rule 10b-5 claim renders the instant federal action non-parallel to the pending *Cusak* action which does not include a Rule 10b-5 claim. Thus, although both this case and *Cusak* involve the same parties and are predicated on the same facts, this court cannot conclude that these two actions are parallel. Defendants' motion to stay proceedings (21) is denied without prejudice. Should the Derivative Plaintiffs' Rule 10b-5 claim drop out of the case as the litigation unfolds, this court would, upon motion of Defendants, revisit this decision.

ENTER:

Dated: February 27, 2006

_____
REBECCA R. PALLMEYER
United States District Judge

---

[15] Defendants also argue that this Rule 10b-5 claim is part of the class pending before Judge St. Eve (also of the Northern District of Illinois) in *Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, Case No. 04 C 1107. (Defs.' Reply, pp. 7-8.) That action arises out of the same inventory rebate scheme alleged in the instant action, but plaintiffs in the case before Judge St. Eve have sought certification of a class including:

> [A]ll persons and entities who purchased or otherwise acquired publicly traded common stock of Whitehall Jewelers, Inc. . . . during the class period beginning November 19, 2001 through December 10, 2003. . . . Excluded from the class are: (I) defendants . . . . Defendants in this action include Whitehall.

(Plaintiff's Motion for Class Certification, p. 1, n.1.) The Derivative Plaintiffs' Rule 10b-5 claim appears to be specifically excluded from the putative class, although the parties before Judge St. Eve are still briefing the class certification issue.